UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
OCTAVIO FRIAS,                   :
                                 :
              Petitioner,        :
                                 :       No. 09 Civ. 2537 (JFK)
       -against-                 :       No. 01 Cr. 307 (JFK)
                                 :
UNITED STATES OF AMERICA,        :       **Opinion and Order**
                                 :
              Respondent.        :
------------------------------X

APPEARANCES:

    For Petitioner:
    Octavio Frias, pro se

    For Respondent:
    Preet Bharara
    U.S. Attorney for the Southern District of New York
       Of Counsel:  Joshua A. Goldberg

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Petitioner Octavio Frias' ("Petitioner" or "Frias") pro se motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  For the reasons that follow, the motion is denied.

## I.    BACKGROUND

In a Superseding Indictment dated January 2, 2003, Frias was charged with committing murder while engaged in a conspiracy to distribute and possess with intent to distribute more than one kilogram of heroin and more than five kilograms of cocaine, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

Frias' jury trial commenced before the Honorable Allen G. Schwartz on March 4, 2003.  The Government's evidence at trial established the following facts.  Mario Lobo ("Lobo") and Roberto Martinez-Martinez, also known as "Papito," operated a large-scale narcotics and gambling operation based out of El Baturro, a restaurant and club located in Manhattan.  Frias was the manager of the restaurant and maintained a close relationship with Papito.  Frias assisted Papito and Lobo in their illegal gambling operation as well as in the distribution of multi-kilogram quantities of heroin and cocaine.  Eventually, the profitability of Lobo and Papito's illegal business was threatened by Lobo's gambling losses, and Papito decided to have Lobo killed.

Most logistical tasks for the planning of Lobo's murder fell to Frias.  In the 1980s, Frias had worked with a man named Miguel Feliz ("Feliz") in the Dominican National Police.  Based on this relationship, Frias recommended and coordinated the hiring of a crew of contract killers, led by Feliz, from a violent crack cocaine organization known as "Las Blue."  On the morning of September 21, 1991, Frias directed the hitmen to El Baturro.  While two gunmen, "Santos" and Freddy Caraballo ("Caraballo"), and Feliz waited inside the restaurant, Frias hugged Lobo to mark him as their target.  The hitmen then

approached Lobo from behind, and Santos delivered one fatal shot to the head.

Soon after, however, another person claimed responsibility for Lobo's murder in an apparent attempt to collect the bounty from the killing.  A dispute arose between Las Blue and another crew with no relation to Frias as to who in fact shot Lobo; this dispute formed the basis of Frias' defense – i.e., that he was not involved because a third party with no relation to him committed the murder.  In order to prove Frias' participation in the murder, the Government introduced the testimony of Feliz, who had pleaded guilty to Lobo's murder, to establish that Frias recruited Las Blue to kill Lobo and that they in fact completed the task.  The Government also put into evidence, among other things, Papito's plea allocution in which he acknowledged hiring an unspecified person to murder Lobo and a latent fingerprint matching Frias' which was lifted from a chair in El Baturro where one of the two shooters had sat.

Frias' trial concluded on March 12, 2003.  After approximately one and a half hours of deliberation, the jury returned a guilty verdict on the single-count Indictment.[1]

On July 1, 2004, the Court sentenced Frias to a term of life imprisonment.  By Summary Order dated September 28, 2005,

---

[1] Judge Schwartz passed away shortly after trial.  The case was reassigned to this Court for sentencing and all subsequent matters.

the Court of Appeals for the Second Circuit affirmed the judgment of conviction against Frias.  However, the Court remanded the case for the limited purpose of resentencing in light of United States v. Booker, 543 U.S. 220 (2005).  United States v. Frias, No. 04-4106-cr, slip op. at 3 (2d Cir. Sept. 28, 2005).  Following a hearing on January 4, 2006, the Court again sentenced Frias to life imprisonment.  By Opinion and Order dated March 31, 2008, the Second Circuit affirmed the reimposed sentence.  United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008).  On October 6, 2008, the United States Supreme Court denied Frias' petition for a writ of certiorari.

On or about February 11, 2009, Frias filed this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Frias claims that he was denied effective assistance of counsel because his attorney:  (1) failed to conduct a thorough investigation in connection with his case; (2) failed to call or subpoena Papito and other potential witnesses at trial; (3) did not properly address or object to the admission of fingerprint evidence; and (4) did not effectively object to the admission of Papito's plea allocution.  Frias also contends he is entitled to a new trial on the basis of "newly discovered" statements by Papito and Caraballo.

## II.  DISCUSSION

## A. Ineffective Assistance of Counsel

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy both elements of the two part inquiry set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms."  Id. at 688.  In reviewing such a claim, the court

> must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way.

United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotations omitted).

Secondly, the petitioner must show prejudice flowing from counsel's defective performance.  Strickland, 466 U.S. at 693. That is, the petitioner must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  "[E]ven professionally unreasonable errors by defense counsel will not warrant setting aside the judgment in a criminal proceeding unless those errors were prejudicial."

Urena v. United States, No. 06 Civ. 6050, 2007 WL 2319136, at *3
(S.D.N.Y. Aug. 8, 2007).

### 1.   Failure to Investigate

Petitioner argues he provided counsel with a list of
potential witnesses who were at El Baturro the night of Lobo's
murder, but that counsel failed to locate them.   Though defense
counsel does have "a duty to make reasonable investigations or
to make a reasonable decision that makes particular
investigations unnecessary," Strickland, 466 U.S. at 691, the
law does not "compel defense counsel to investigate
comprehensively every lead or possible defense . . . or 'to
scour the globe on the off-chance something will turn up.'"
Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (quoting
Rompilla v. Beard, 545 U.S. 374, 383 (2005)).   Indeed,
constitutional error generally comes into play when counsel
fails to undertake any investigation, not when counsel makes a
reasonable effort to secure evidence but is simply unsuccessful.
See id. at 322 ("In nearly every case that concludes that
counsel conducted a constitutionally deficient investigation,
the courts point to readily available evidence neglected by
counsel.").

In a sworn declaration submitted in connection with this
motion, Frias' trial counsel, Mr. Andrew Patel, confirms that he
and the defense team, with the assistance of a Spanish-speaking

investigator, "spoke to numerous witnesses, attempted to
interview every potential witness suggested by Mr. Frias,
visited multiple locations, and had numerous conversations with
Frias's family members." (Patel Decl. ¶ 3).  Furthermore,
counsel and the investigator "went to every location where Frias
said someone useful might be found," including El Baturro.  (Id.
¶ 4).  As Petitioner could only provide partial information
about some of the potential witnesses, for example, just a first
name or nickname, and as Lobo's murder took place more than ten
years prior to the time of trial, it is not surprising that Mr.
Patel could not locate or secure useful testimony from each
person on the list Petitioner provided.  Counsel's actions
demonstrate reasonable diligence in an attempt to secure
witnesses favorable to the defense; that these efforts were
unproductive does not render his representation ineffective.
See Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y.
1995) ("Petitioner's bald assertion that counsel should have
conducted a more thorough pre-trial investigation fails to
overcome the presumption that counsel acted reasonably.").

     Moreover, "[a]n attorney's failure to investigate is
considered reasonable unless there is some indication that the
investigation would have changed the result of the proceeding.
Mere speculation that the investigation may lead to a different
outcome is insufficient."  Mocombe v. United States, No. 02 Civ.

1846, 2005 WL 730566, at *3 (S.D.N.Y. Mar. 31, 2005).  One of
the witnesses Petitioner requested his counsel interview,
Deyanara Salazar, eventually testified for the Government.
However, even assuming a more thorough investigation would have
led Mr. Patel to locate her before the prosecutors did, there is
no reason to believe that she would have testified differently
or in any way exculpated Petitioner.  In fact, Petitioner
asserts that Salazar "did not provide . . . any testimony
implicating Frias in Lobo's murder, she only described the scene
and the circumstances [of] what happened the night of the murder
in the restaurant," (Reply at 7), and thus any investigative
failings on counsel's part did not hinder the defense.
Similarly, there is no indication as to what information other
people could have given, much less whether that information
would have been exculpatory, or whether those people would agree
to testify.  Petitioner has not demonstrated any prejudice
caused by Mr. Patel's inability to locate and interview
potential witnesses.

### 2.   Failure to Call Witnesses

Petitioner's argument may more accurately be characterized
as a claim that Mr. Patel should have called those witnesses he
was able to locate, including Papito and Caraballo – one of the
Las Blue shooters – to testify at trial.  However, trial counsel
is entitled to broad discretion in choosing a witness list, and

"counsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)).  This is true chiefly because counsel's "decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998).  In light of Mr. Patel's recollection that the people he interviewed "generally were unwilling to speak with us or to testify on Frias's behalf," (Patel Decl. ¶ 4), the Court cannot say that counsel's decision not to call these witnesses was unreasonable.

Furthermore, Petitioner asserts that the potential witnesses were present at El Baturro at the time of the murder, but provides no affidavits affirming the testimony they might have supplied or any description of how the testimony would have changed the outcome of trial.  Petitioner even acknowledges that many of the potential witnesses "could have corroborated the facts of the case for the prosecution." (Petition at 12).  This bizarre admission demonstrates that Petitioner may have in fact benefited from counsel's decision not to call these witnesses; therefore, he has not demonstrated any prejudice caused by Mr. Patel's conduct.

In a related argument, Petitioner specifically faults Mr. Patel for failing to call Papito to testify at trial.  In proffer sessions with the Government, Papito made certain statements to the effect that Petitioner did not arrange Lobo's murder.  The Government disclosed these statements to defense counsel prior to trial, and Mr. Patel subsequently inquired if Papito would testify for the defense.  However, Papito's counsel made clear that "if he were called as a witness Papito would exercise his Fifth Amendment right to refuse to testify," likely because, although he had pleaded guilty to the charges stemming from Lobo's murder, Papito still faced charges related to his involvement in other murders.  (Patel Decl. ¶ 6).  Judge Schwartz further confirmed this understanding, noting in a pre-trial ruling that "there is no question but that [Papito] is unavailable as a witness.  Everyone seems to agree to that." (A. 47).  Cf. United States v. Muyet, 958 F. Supp. 136, 138 (S.D.N.Y. 1997) (a potential witness "whose attorney represents that the declarant will assert his privilege against self-incrimination if called to testify . . . is unavailable for purposes of Rule 804(b)(3)").  Mr. Patel's decision not to call a witness who would not provide useful, if any, testimony does render his representation unreasonable.[2]  See Savinon v. Mazucca,

---

[2] To the extent Petitioner also challenges counsel's failure to introduce into evidence notes memorializing Papito's proffer

318 F. App'x 41, 43-44 (2d Cir. 2009) (failure to procure
witness by subpoena or material witness warrant did not
constitute ineffective assistance of counsel where witness
unequivocally stated his intent to invoke Fifth Amendment
privileges); Greiner, 417 F.3d at 323 (no ineffective assistance
of counsel where "insofar as [trial counsel] believed that [an
uncalled witness] would have refused to testify by invoking a
valid privilege . . . [counsel] acted consistently with the
norms of practice reflected in the ABA Standards and with well-
established New York law in refusing to call him to the stand").

    Similarly, Petitioner asserts that Caraballo should have
been called to the witness stand.  As it must view counsel's
strategic decisions deferentially, the Court credits Mr. Patel's
recollection that he followed up on Petitioner's information but
did not present Caraballo's testimony either because Caraballo
refused to speak to counsel or stated that he would invoke his
Fifth Amendment privileges if called as a witness.  This is
further confirmed by the fact that Petitioner did not submit an
affidavit or any other statement from the witness himself
stating that he would have testified for the defense.

---

session statements, the Court defers to counsel's tactical
decisions.  Additionally, the statements were likely
inadmissible hearsay.  See Sanchez v. United States, No. 04 Civ.
1827, 2005 WL 1005159, at *3 (S.D.N.Y. Apr. 30, 2005) (holding
that "failure to assert a baseless claim does not fall below an
objective standard of reasonableness nor [does it] prejudice the
defendant").

Petitioner claims that Caraballo was available to testify because he was incarcerated at the time of trial; although counsel may have been able to have the witness transported to court, he could not have compelled Caraballo's testimony.  As Caraballo was unavailable, counsel's decision not to call him as a witness was reasonable.

Moreover, a careful review of the statements Caraballo had previously made to the Government indicates that, had he been called as a defense witness, his testimony in many ways would have corroborated the prosecution's case.  Although he did not mention Petitioner by name, Caraballo's earlier statements confirmed that Papito wanted Lobo killed, that Las Blue took the contract for the murder, that Caraballo and Santos were the shooters, that another person later tried to take credit for the shooting, and that Papito had "a guy in the restaurant when the shooting happened as a witness" who verified to Papito that Las Blue murdered Lobo.  (Gov't Mem., Ex. D).  As Petitioner now claims that another person, not affiliated with Las Blue, killed Lobo, Caraballo's confession to the murder would have corroborated Feliz's testimony and strengthened the Government's case.  As with other uncalled witnesses, Petitioner benefited from Caraballo's silence, and therefore, any error on counsel's part did not prejudice the outcome of the trial.

### 3.   Failure to Object to Fingerprint Evidence

Petitioner argues that defense counsel was ineffective for failing to object to the introduction of fingerprint evidence. However, Mr. Patel filed a pre-trial motion to preclude or limit expert testimony related to both fingerprint comparison and ballistics evidence.  Judge Schwartz denied the motion on February 10, 2003.  Mr. Patel subsequently moved for reconsideration of the Order denying the motion to preclude; Judge Schwartz reaffirmed his decision in a Memorandum Order dated February 13, 2003.  Petitioner makes no assertion that Judge Schwartz's evidentiary rulings were contrary to the law, and it cannot be said that defense counsel's repeated but unsuccessful challenge of the fingerprint evidence fell below any standard of reasonable attorney conduct.

Moreover, at trial, defense counsel mounted a vigorous attack on the value of the fingerprint evidence.  During cross-examination, counsel was able to establish that the expert only obtained four latent prints, that the expert never attempted to match those prints to the alleged Las Blue shooters, and that, since Petitioner worked at El Baturro for years, there was no way to confirm that Petitioner touched the chair where his print was found on the night of Lobo's murder.  Petitioner is particularly adamant about counsel's failure to ask the fingerprint expert whether he lifted any prints off the glasses

that were used by Lobo's shooters.   However, the Court gives

wide latitude to an attorney's decision to pursue one particular

line of questioning over another.   <u>See</u> <u>United States v.</u>

<u>Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987) (holding that the

"manner" and "extent" to which counsel conducts cross-

examination are strategic decisions that, when "reasonably made,

will not constitute a basis for an ineffective assistance

claim").   In light of the extensive cross-examination, counsel's

method of challenging the fingerprint evidence cannot be

characterized as unreasonable.

### 4.   Failure to Object to Papito's Plea Allocution

Judge Schwartz allowed the Government to introduce Papito's

plea allocution as a statement against interest under Rule

804(b)(3) of the Federal Rules of Evidence.   Petitioner now

argues that counsel should have objected to its admission.   As

previously discussed, the Court allows counsel broad discretion

in making tactical decisions at trial.   Moreover, under the pre-

<u>Crawford v. Washington</u> law prevailing at the time, counsel was

constrained by the "well-settled principle that plea allocutions

of unavailable co-conspirators are admissible at trial as

statements against interest, and therefore fall within an

exception to the hearsay rule." <u>United States v. Becker</u>, 502

F.3d 122, 127 (2d Cir. 2007) (internal quotations omitted).

Therefore, counsel's next best option was to object to the plea

allocution on relevancy grounds, which he did, causing the
Government to redact additional information from Papito's plea
allocution.  Counsel cannot be held accountable for failing to
make what would have been a baseless hearsay objection; thus Mr.
Patel's actions were not objectively unreasonable when viewed in
light of the state of the law at the time.  See United States v.
Montilla, 85 F. App'x 227, 229-30 (2d Cir. 2003) (counsel's
failure to make hearsay objection to wiretap recordings did not
constitute ineffective assistance where the evidence was
properly admissible under the Federal Rules of Evidence).
Additionally, this Court agrees with the Second Circuit's
analysis that given the strength of the Government's case,
Petitioner cannot affirmatively establish prejudice from the
introduction of Papito's plea allocution.

To the extent Petitioner separately argues that the
admission of Papito's plea allocution violated the Sixth
Amendment confrontation protections later established in
Crawford v. Washington, 541 U.S. 36 (2004), that claim was
rejected by the Court of Appeals on direct appeal as harmless
error.  Specifically, the Court noted that "the introduction of
the allocution for the limited purpose of establishing Papito's
role in the conspiracy did not affect the outcome of the trial,
in light of the extensive testimony and evidence implicating
Frias in the conspiracy."  Frias, No. 04-4106-cr, slip op. at 2.

"It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal,'" United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (quoting Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992)), and therefore, Petitioner is procedurally barred from raising this argument in the instant § 2255 motion.

### B. Newly Discovered Evidence

In support of this motion, Petitioner submitted a December 18, 2008 affidavit from Papito in which he claims that Petitioner had no knowledge of Lobo's murder.  Petitioner claims that Papito's affidavit is "newly discovered evidence" mandating a new trial.  If Petitioner intends to proceed under Rule 33 of the Federal Rules of Criminal Procedure, the three year statute of limitations for that motion has long since expired.  See Fed. R. Crim. P. 33(b)(1).  On the other hand, if Petitioner is arguing that Papito's affidavit reveals his actual innocence of the crime of which he was convicted, that claim is not cognizable as "[d]istrict courts . . . have repeatedly held that a 'freestanding' claim of actual innocence based on newly discovered evidence, i.e., one unaccompanied by an allegation of some constitutional error, does not provide a basis for habeas relief." Pimentel v. United States, No. 96 Civ. 5891, 2008 WL 2151796, at *7 (S.D.N.Y. May 21, 2008).

Regardless of the legal theory under which Petitioner proceeds, the obvious defect in this argument is that the information in Papito's affidavit is not newly discovered.  In describing the affidavit, Petitioner explained that "Roberto Martinez (Papito) once again corroborated what he stated before, in interviews with the FBI, that Octavio Frias is completely innocent of the murder of Mario Lobo."  (Petition at 16) (emphasis added).  Petitioner's own words concede not only that Papito's information had long since been made public, but also that he (and the Government) knew about the statements prior to trial.  Indeed, those brief, bare statements put forth in Papito's affidavit are essentially duplicative of the inadmissible statements he made to the Government in 2002. Thus, Papito's statements plainly do not qualify as "newly discovered" evidence justifying habeas relief.

### C. **Brady** Violation

In connection with its opposition to Petitioner's § 2255 motion, the Government disclosed for the first time two documents memorializing Caraballo's statements relating to his involvement in Lobo's murder.[3]  In his reply brief, Petitioner asserts that the Government withheld this evidence in

---

[3] Specifically, the Government attached to its opposition papers: (1) a redacted report of a February 6, 1999 interview New York police officers conducted with Caraballo regarding the El Baturro shooting; and (2) an undated document entitled "Summary of Homicides" relating similar information.

contravention of its discovery obligation under <u>Brady v.</u>
<u>Maryland</u>, 373 U.S. 83 (1963).  To establish a <u>Brady</u> violation,
petitioner must show that the Government withheld material
evidence favorable to the accused, either because it is
exculpatory or because it is impeaching.  <u>See</u> <u>United States v.</u>
<u>Coppa</u>, 267 F.3d 132, 139 (2d Cir. 2001).  Undisclosed evidence
is material only if it "could reasonably be taken to put the
whole case in such a different light as to undermine confidence
in the verdict."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).

There are no facts on which the Court can determine that
Caraballo's statements would tend to exculpate Petitioner.  In
his opening brief, Petitioner argued that Caraballo denied
having been at El Baturro on the night of Lobo's murder, and
evidence to that effect would support the theory that another
crew, not Las Blue, killed Lobo.  However, Caraballo, who was a
member of Las Blue, flatly admitted to shooting Lobo in the
police report, which would have directly contradicted this
defense.  Unlike Papito's assertion, disclosed prior to trial,
that Petitioner had no foreknowledge of the murder, Caraballo's
statements do not mention Petitioner at all; while this could be
seen as evidence that Petitioner was not drawn in to the plot to
kill Lobo, the statements do not disclaim Petitioner's knowledge
of or involvement in the plan.  Most importantly, although
Caraballo does not refer to Petitioner by name, he does state

that Papito had "a guy" at El Baturro who could confirm the
identity of the shooter; it would not be much of a leap for the
jury to infer that Papito's eyewitness was Petitioner.

Moreover, as previously discussed, Caraballo provided
extensive details about the parties involved in Lobo's murder,
the weapons they used, and the resulting dispute between Las
Blue and the rival crew.  All of this information corroborates
Feliz's testimony and would have bolstered the Government's case
had it been introduced; thus, the statements cannot be
considered exculpatory.

In his reply brief, Petitioner argues that Caraballo's
statements should have been disclosed because they conflict with
the testimony of the Government's witness Feliz.[4]  There were
small differences in Caraballo's and Feliz's recitations of the
events leading up to and after Lobo's murder; for example, one
party recalled going to the Bronx after the murder and the other
thought they went to Queens.  However any inconsistencies were
inconsequential and do not at all detract from the fact that
both parties confirmed that the Las Blue crew was responsible
for shooting Lobo.  At best, Caraballo's statements would have
had marginal impeachment value to the defense.  When weighed
against the likelihood that the statements would have
corroborated much of Feliz's testimony, along with all of the

---

[4] The Government did not call Caraballo as a witness.

other evidence at trial, the Court cannot say that the addition of Caraballo's statements would so change the proceedings as to undermine confidence in the guilty verdict.  See United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998) (undisclosed impeachment evidence is not material when "'although possibly useful to the defense,' it is 'not likely to have changed the verdict'" (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)).  Consequently, the Government was not required to turn over Caraballo's statements under Brady.

### III. CONCLUSION

Petitioner's § 2255 motion is denied.  No hearing is necessary because Petitioner's claims are insufficient as a matter of law and the habeas record conclusively establishes that he is entitled to no relief.  See 28 U.S.C. § 2255. Additionally, Petitioner has not made a substantial showing of the denial of a constitutional right, and the Court declines to issue a certificate of appealability; Petitioner may seek the certificate from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.

**SO ORDERED.**

**Dated:    New York, New York**
**September/3, 2010**

John F. Keenan
**United States District Judge**

21